**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1755
_____

UNITED STATES OF AMERICA

v.

THOMAS S. PENDLETON,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE
(D.C. Crim. No. 08-cr-59-1)
District Judge:  Honorable Gregory M. Sleet
_____

Submitted Under Third Circuit LAR 34.1(a)
March 14, 2011
_____

Before: RENDELL, BARRY
and CHAGARES, Circuit Judges

(Opinion Filed: April 12, 2011)
_____

Eleni Kousoulis, Esq.
Daniel I. Siegel, Esq.
Office of the Federal Public Defender
800 King Street
Suite 200
Wilmington, DE 19801

Counsel for Appellant

Ilana H. Eisenstein, Esq.
Office of the United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899
      -AND-
Jennifer Leonardo, Esq.
United States Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, N.W.
Washington, D.C. 20530

Counsel for Appellee

————————

OPINION OF THE COURT
————————

BARRY, Circuit Judge

Thomas Pendleton, previously convicted of a qualifying sex offense, was convicted under 18 U.S.C. § 2250(a) for traveling in interstate and foreign commerce and knowingly failing to register under the Sex Offender Registration and Notification Act ("SORNA"). On appeal, he challenges the sufficiency of the evidence at trial, as well as SORNA's constitutionality under the Due Process and Commerce Clauses. We will affirm.

## I.     BACKGROUND

The one-count indictment in this case charged that

[f]rom on or about January 28, 2008, to on or about March 10, 2008, in the State and District of Delaware and elsewhere, THOMAS S. PENDLETON, defendant herein, a person required to register under Sex Offender Registration and Notification Act, Title 42,

2

United States Code, Section 16901 *et seq.* ("SORNA"), having traveled in interstate and foreign commerce subsequent to his conviction for a sex offense, to wit, a conviction on or about September 30, 1992, in the state of New Jersey, and a conviction on or about October 16, 2006, in District Court of Kempten, Germany, did knowingly fail to register and update a registration as required by SORNA, in violation of Title 18, United States Code, Section 2250(a).

(R. at 58.) The parties stipulated that Pendleton was convicted of the two sex offenses identified in the indictment and agreed that he was, therefore, a "sex offender" under SORNA.

## A.    Pendleton's Registration Status

Pendleton was registered as a sex offender in Washington, D.C. in 2005 and for some period of time before then, but in an email dated April 29, 2005, he informed Yolanda Stokes, the sex offender registry specialist who oversaw his registry, that he was moving to Delaware. He wrote,

Effective May 1, 2005, I am moving my residence from the District of Columbia to the State of Delaware. I have already been in contact with the Delaware authority confirming my responsibilities there. . . . In case you need it, my new address is: 202 West 14th Street, Wilmington . . . 19801 [the "Wilmington Address"]. My cell phone remains unchanged . . . .

 (*Id.* at 237-38 (internal quotation marks omitted).) Stokes then closed her file on Pendleton, contacted the Delaware authorities, and sent them information regarding him. In early 2008 and again at the time of trial in April of 2009, an officer with the Delaware State Police Sex Offender Apprehension and Registration Unit searched Delaware records and

determined that Pendleton never registered as a sex offender there.

## B. Pendleton's Claims of Delaware Residence

On May 4, 2005, Pendleton applied for a driver's license from the Delaware Division of Motor Vehicles. He gave the Wilmington Address as his address and signed a statement in which he certified,

> under penalty of perjury, that the information on this application is true and correct, to the best of my knowledge, and that I am a bona fide resident of Delaware. . . . I understand that all convicted sex offenders must register with the Delaware State Police within seven days of coming into the state as explained on this form.

(*Id.* at 251.) Pendleton also used the Wilmington Address when he filled out and signed a voter registration form at the Division of Motor Vehicles on which he stated that he was "a permanent resident of the State of Delaware at the address given above [the Wilmington Address]." (*Id.* at 249.)

Pendleton listed the Wilmington Address as both his mailing address and permanent address in a passport application dated October 5, 2005. On October 2, 2006, he again applied for a passport, with his mailing address in Kempten, Germany and the Wilmington Address as his permanent address. In a third passport application on February 29, 2008, within the time period alleged in the indictment, he listed the Wilmington Address as his current and permanent address.

Pendleton went to Germany in November of 2005 and was convicted of a sex offense there on October 16, 2006. After he served his prison sentence for that offense, he was deported to the United States, and he arrived at JFK Airport on January 21, 2008. William McAlpin, an agent with Immigration and Customs Enforcement, interviewed him upon his arrival at JFK. Pendleton listed the Wilmington

4

Address on his customs declaration form and told McAlpin that "he was residing" there and planned to go there after spending some time visiting friends in New York City. (*Id.* at 254-55.) He also told McAlpin that the Wilmington Address "was an apartment within a home owned by one Richard Bayard." (*Id.* at 257.) Pendleton then sent an email to Mr. Bayard to let him know that he gave the address to customs officials when he came through the airport, and that "a strange call might come about me. I explained that it was your home and did not correct his impression that I rented a room from you." (*Id.* at 300.)

Mr. Bayard owned the single-family home at the Wilmington Address. His adult daughter, Kate Bayard, lived there for most of her life with her family and has lived there alone since 2006. Ms. Bayard testified that Pendleton "was friendly with [her] parents," but she does not remember meeting him. (*Id.* at 263.) As far as she knows, Pendleton did not have a key to the house, never stayed there overnight or asked to do so, and did not come in the house. Ms. Bayard did not know that Pendleton used her address to obtain a driver's license, apply for a passport, or register to vote.

At some point between 2002 and 2006, Pendleton asked Mr. Bayard to hold his mail while he was traveling. He picked up his mail once, and then the Bayards "didn't hear from him for a number of years." (*Id.* at 265.) In 2008, Pendleton contacted Mr. Bayard to pick up his mail, and Ms. Bayard arranged to leave the mail in the mailbox in front of the house. Deputy United States Marshal William David had been investigating Pendleton's compliance with SORNA and made arrangements with Ms. Bayard for Pendleton's mail to be in the mailbox at the Wilmington Address on the afternoon of March 10, 2008.

David went to the Wilmington Address on the prearranged day and approached Pendleton, who had checked the mailbox and was standing on a nearby street corner. After David identified himself, he asked Pendleton for identification, and Pendleton produced a Delaware driver's license that was issued on May 13, 2005 with the Wilmington

5

Address on it. When David asked, Pendleton said that he lived at the Wilmington Address but "had lost his key and was waiting for the other occupant to get home to let him in." (*Id.* at 283.) Pendleton also showed David his passport and a membership card for Hostelling International, which had the Wilmington Address on it. Pendleton said he had just come from the library in Wilmington but was staying at a hostel in Philadelphia because he "had business" there. (*Id.* at 284.) A receipt showed that he paid to stay at the hostel in Philadelphia from March 7 to 11, 2008. The hostel later sent his belongings to the United States Marshal's Service, and his name and the Wilmington Address were written on a luggage tag on one of those items.

David arrested Pendleton, read him his rights, and told him that he was charged with a violation of § 2250 for failure to register as a sex offender. Pendleton first denied being a sex offender and then said that he was a sex offender but was not required to register. After he was arrested, the government executed a search warrant on an email account that he used. Emails that he sent and received in late January of 2008, after he was deported from Germany to the United States, show that he researched sex offender registration requirements in Delaware and correctly concluded that at that time he was not required to register under Delaware law.

### C.    Pendleton's Travels in Early 2008

Based on his examination of Pendleton's emails, travel documents, and other items, David concluded that after Pendleton arrived at JFK on January 21, 2008, he stayed in New York for about five days and then traveled to Philadelphia on or about January 26th. On February 1st, he traveled to Delaware, and left for Washington, D.C. on or about February 4th. According to David's testimony and Amtrak tickets in Pendleton's name, Pendleton traveled starting on February 9th from Washington, D.C. to Chicago; starting on February 12th from Chicago to Emeryville, California; starting on February 26th from Los Angeles to Chicago; and starting on March 2nd from Chicago to Washington, D.C. On March 7th, he traveled to Philadelphia,

and then on March 10th, he traveled to Wilmington and was arrested. Pendleton had a one-way airplane ticket to travel on March 12, 2008 from JFK to Prague, Czech Republic.

## II.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Our review of the Court's denial of Pendleton's motion for judgment of acquittal, its construction of SORNA, and its conclusion that SORNA is constitutional is plenary.

## III.  ANALYSIS

The Adam Walsh Child Protection and Safety Act of 2006, which included SORNA,[1] "was enacted to close the loopholes in previous sex offender registration legislation and to standardize registration across the states." *United States v. Shenandoah*, 595 F.3d 151, 154 (3d Cir. 2010). In response to previous legislation, by 1996 every state and the District of Columbia had mandatory sex offender registration laws, but "SORNA creates a national sex offender registry with the goal of eliminating inconsistencies among state laws." *Id.*

---

[1] Title I of the Adam Walsh Child Protection and Safety Act of 2006 was itself named the "Sex Offender Registration and Notification Act" (SORNA), and both 42 U.S.C. § 16913, which contains the sex offender registration requirement, and 18 U.S.C. § 2250, which contains the criminal enforcement provision under which Pendleton was convicted, were enacted through Title I of that Act. Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, §§ 101, 113, 141, 120 Stat. 587, 590, 593-94, 601-02 (2006).

As defined by statute, "SORNA" thus includes both §§ 16913 and 2250. In *United States v. Shenandoah*, we upheld the constitutionality of "SORNA" under the Commerce Clause, but did not specifically address § 16913. *See United States v. Shenandoah*, 595 F.3d 151, 160-61 (3d Cir. 2010). We will do so here.

7

When Congress enacted SORNA, it was particularly concerned about the transient nature of many sex offenders and did not want to lose track of sex offenders when they moved from state to state. *United States v. Howell*, 552 F.3d 709, 716-17 (8th Cir. 2009). Recognizing this, the Eighth Circuit "reject[ed] the suggestion that a savvy sex offender can move to a different city and avoid having to update his SORNA registration by sleeping in a different shelter or other location every night." *United States v. Voice*, 622 F.3d 870, 875 (8th Cir. 2010). Given Pendleton's extensive travel, the government argues that a similar concern regarding transience is present in this case.

Under the relevant provision of 42 U.S.C. § 16913(a), "[a] sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." A "jurisdiction" is, among other things, "[a] State." 42 U.S.C. § 16911(10)(A). "The term 'resides' means, with respect to an individual, the location of the individual's home or other place where the individual habitually lives." 42 U.S.C. § 16911(13). A sex offender must "appear in person" in at least one of the applicable jurisdictions "not later than 3 business days after each change of name, residence, employment, or student status . . . and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry." 42 U.S.C. § 16913(c).

Pendleton was convicted *not* under § 16913, which does not have an enforcement provision, but under 18 U.S.C. § 2250(a), which provides that a person commits a crime when he or she "(1) is required to register under the Sex Offender Registration and Notification Act; (2) . . . (B) travels in interstate or foreign commerce . . . ; and (3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act." In other words, "[o]nce a person becomes subject to SORNA's registration requirements . . . that person can be convicted under § 2250 if he thereafter travels and then fails to register." *Carr v. United States*, 130 S. Ct. 2229, 2236 (2010).

Pendleton does not dispute on appeal that he was a sex

8

offender under § 16913, that he traveled in interstate and foreign commerce after those offenses and during the time period alleged in the indictment, and that he knowingly did not register as a sex offender in Delaware. Rather, he challenges the sufficiency of the evidence that he "reside[d]" in Delaware and was required to register there. He also argues that he did not have fair notice of a requirement to register in Delaware, which failure he claims violates the Due Process Clause, and that § 16913 exceeds Congress's power under the Commerce Clause.[2]

## A.    Sufficiency of the Evidence

As we noted above, our review of the District Court's construction of SORNA and denial of Pendleton's Rule 29 motion is plenary. We apply, however, a highly deferential standard of review to the jury's verdict.

> We must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. We do not weigh evidence or determine the credibility of witnesses in making this determination. In making our review we examine the totality of the evidence, both direct and circumstantial. We must credit all available inferences in favor of the government.

*United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks, punctuation, and citations omitted). We will "sustain the verdict unless it is clear that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . [W]e will only find the evidence insufficient when the prosecution's failure is clear."

---

[2] Pendleton also contends that Congress exceeded its Commerce Clause power in enacting § 2250, but recognizes that we upheld the constitutionality of § 2250 in *Shenandoah*. He filed a supplemental brief arguing that SORNA violates the Tenth Amendment, but did not raise that issue in his opening brief and it is, therefore, waived.

*United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (citations omitted).

As relevant to the issues before us on appeal, Pendleton argued to the District Court that the government failed to prove that he resided in any relevant jurisdiction during the period identified in the indictment. The Court noted that at trial the government proceeded on the theory that Pendleton resided in Delaware. The government sought to prove this by showing that he used the Wilmington Address as a "mail drop" and that he repeatedly claimed to reside there. (R. at 29.)

The District Court assumed but did not decide that Pendleton did *not* habitually live at the Wilmington Address. The Court "consider[ed]" guidelines that the Attorney General issued several months after Pendleton's arrest and found that the "guidelines seem to imply that . . . a mail drop or a location that Pendleton identifies as his home address, is one of the places where a sex offender is required to register under SORNA." (*Id.* at 35-36.) The Court held that the Wilmington Address was Pendleton's "home" under SORNA because he "not only used [that address] as a mail drop, but also listed the address as his legal residence on a number of occasions and for a number of purposes between 2005 and 2008." (*Id.* at 36; *see also id.* at 37 n.3.) Pendleton argues that he resided in a jurisdiction under SORNA only if he "habitually live[d]" there and that the Court violated the Ex Post Facto Clause when it considered the Attorney General's guidelines in his case.

Under SORNA, "[t]he term 'resides' means, with respect to an individual, the location of the individual's home *or other* place where the individual habitually lives." 42 U.S.C. § 16911(13) (emphasis added). Because Congress used the phrase "or other," Pendleton contends that "home" is at least partially defined as a place where a sex offender "habitually lives." He claims that an address that is solely a mail drop cannot be where a person resides because one does not habitually live at a mail drop. It is not necessary for us to reach this issue regarding the interim rule, however, because

10

Pendleton stated numerous times – including during the time period alleged in the indictment – that he *actually lived* at the Wilmington Address, not only that it was his mailing address. A rational trier of fact could have concluded from those statements that Pendleton "habitually live[d]" at the Wilmington Address.

Pendleton contends that, given Ms. Bayard's testimony that he had never been inside or stayed overnight at the Wilmington Address, the jury could not have found that he habitually lived at the Wilmington Address. The jury, however, was free to disregard her testimony. Pendleton claimed many times over a number of years and during the period alleged in the indictment – perhaps most notably to the Deputy United States Marshal who arrested him outside that address – that he actually lived at the Wilmington Address. A rational trier of fact could have taken him at his word and found that he habitually lived there at some point from January 28 to March 10, 2008.[3]

Pendleton also argues that a sex offender does not reside or habitually live somewhere until he or she has been in that location for three business days, but SORNA does not contain such a limitation. SORNA requires a sex offender to "appear in person" in an applicable jurisdiction, including where he or she resides, "not later than 3 business days after

_____

[3] In the alternative, Pendleton argues "that the government had not met its burden on the 'resides' element, because it had not proved that Mr. Pendleton maintained a dwelling place in the State of Delaware." (Appellant's Br. at 2.) But SORNA does not require a sex offender to register where he or she "maintain[s] a dwelling place." SORNA, rather, mandates that a sex offender register "in each jurisdiction where the offender resides," 42 U.S.C. § 16913(a), which is where he has his "home or other place where [he] habitually lives," 42 U.S.C. § 16911(13). There was sufficient evidence not only for a rational juror to conclude that Pendleton resided at the Wilmington Address but also that he "habitually live[d]" somewhere in Delaware and he was, therefore, required to register in that jurisdiction.

each change of . . . residence . . . and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry." 42 U.S.C. § 16913(c). SORNA's three-day time period prescribed the time *by* which Pendleton was required to register in Delaware, not how long he was required to stay without interruption in Delaware before it became the place where he "habitually live[d]." *See Shenandoah*, 595 F.3d at 157.

We will affirm the District Court's conclusion that sufficient evidence supported the conviction.

## B.      Due Process and Fair Notice

There is no dispute that at the time Pendleton was arrested, he was not required to register as a sex offender under *Delaware* law. SORNA imposes a federal requirement that "[a] sex offender shall register, and keep the registration current, *in* each jurisdiction where the offender resides," which in this case was Delaware. 42 U.S.C. § 16913(a) (emphasis added). Pendleton argues that as applied to him, SORNA violates the Due Process Clause because he did not have fair notice that *federal* law required him to register in Delaware, even though *Delaware* law did not.

"The Supreme Court has explained that a statute is unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Interactive Media Entm't & Gaming Ass'n, Inc. v. Attorney General*, 580 F.3d 113, 116 (3d Cir. 2009) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Pendleton contends that SORNA fails the "fair notice" element of this test in his case because it "directs an individual to register in the sex offender registry of a jurisdiction which does not require that he register as a sex offender." (Appellant's Br. at 32.)  He argues that a person of ordinary intelligence would not know that federal law required him to do so when Delaware law did not.

Federal law, however, often imposes requirements or

12

restrictions that are different from state law. For example, California and other states "authorize the use of marijuana for medicinal purposes," but federal law prohibits that activity. *Gonzales v. Raich*, 545 U.S. 1, 5, 7-8 (2005). Medicinal marijuana users in California and elsewhere could be using marijuana legally under state law, but still be vulnerable to federal prosecution. Similarly, Pendleton was not required to register under Delaware law, but was still vulnerable to federal prosecution for failing to register.

In *Shenandoah*, moreover, the defendant argued that SORNA did not apply to him because New York and Pennsylvania, the two states in which the government alleged that Shenandoah was required to register, had not yet implemented SORNA. We rejected that argument and concluded that "an independent and federally enforceable duty is placed on sex offenders to register." *Shenandoah*, 595 F.3d at 157. Even if New York and Pennsylvania never implemented SORNA, such "failure to implement a federal law . . . [would] not give sex offenders a reason to disregard their federal obligation to update their state registrations." *Id.* Instead, "[w]hen a sex offender travels in interstate commerce and disobeys the federal command to keep his or her registration current, as required by SORNA, he or she is subject to prosecution." *Id.*; *see also United States v. Guzman*, 591 F.3d 83, 93 (2d Cir. 2010) ("SORNA creates a federal duty to register with the relevant existing state registries regardless of state implementation of the specific additional requirements of SORNA.").

Put simply, Pendleton's federal duty to register under SORNA was not dependent upon his duty to register under Delaware law. A person of ordinary intelligence would not assume that as long as he or she complied with state law on a particular issue, there would be no risk of running afoul of federal law. We therefore reject Pendleton's argument as to fair notice under the Due Process Clause.

C.      **Commerce Clause**

13

Although recognizing that in *Shenandoah* we upheld the constitutionality of § 2250 under the Commerce Clause, Pendleton argues that (1) § 16913 is an unconstitutional exercise of Congress's Commerce Clause power and (2) because lack of compliance with § 16913 is a necessary element of § 2250, § 2250 is also unconstitutional.

"It has been long established Congress may forbid or punish use of interstate commerce 'as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin.'" *United States v. May*, 535 F.3d 912, 921 (8th Cir. 2008) (quoting *Brooks v. United States*, 267 U.S. 432, 436 (1925)), *quoted in Shenandoah*, 595 F.3d at 161. Furthermore, "'the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'" *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (quoting *Caminetti v. United States*, 242 U.S. 470, 491 (1917)), *quoted in United States v. Lopez*, 514 U.S. 549, 558 (1995).

> In *Lopez*, the Supreme Court explained that it had
>
> identified three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

514 U.S. at 558-59 (citations omitted). In *Shenandoah*, we held that SORNA "derives its authority from each prong of *Lopez*, and most specifically" the first and second *Lopez*

14

prongs. 595 F.3d at 161. When a sex offender travels between states, he or she is a person in interstate commerce who travels via the use of the channels of interstate commerce. *See id.*

Pendleton claims that *Shenandoah* does not foreclose his Commerce Clause challenge because in *Shenandoah* we did not analyze the constitutionality of § 16913 separately from § 2250. He contends that § 16913 is beyond the bounds of the Commerce Clause because it requires registration from all sex offenders, not just those who travel in interstate commerce. The government argues that § 16913 is a valid exercise of Congress's Commerce Clause power through the Necessary and Proper Clause.

Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the powers that it has under, *inter alia*, the Commerce Clause. U.S. Const. art. I, § 8, cl. 18. Discussing the scope of the Necessary and Proper Clause many years ago, the Supreme Court wrote, "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *M'Culloch v. Maryland*, 17 U.S. 316, 421 (1819). Discussing that Clause more recently, the Supreme Court stated that "the relevant inquiry is simply 'whether the means chosen are reasonably adapted to the attainment of a legitimate end under the commerce power' or under other powers that the Constitution grants Congress the authority to implement." *United States v. Comstock*, 130 S. Ct. 1949, 1957 (2010) (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)) (upholding through the Necessary and Proper Clause a "federal civil-commitment statute [that] authorizes the Department of Justice to detain a mentally ill, sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released," *id.* at 1954) (further internal quotation marks omitted); *see also Raich*, 545 U.S. at 35 (Scalia, J., concurring) ("Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not

themselves substantially affect interstate commerce.").

In upholding § 16913 under the Commerce Clause and the Necessary and Proper Clause, the Second Circuit noted that (1) "§ 16913 does not exist in a vacuum" but rather complements § 2250; (2) by the time SORNA was enacted, every state had a sex offender registry, so SORNA was not solely focused on creating a registry; and (3) the enforcement provision in § 2250(a) would not affect a sex offender convicted in state court who did not travel between states or countries. *Guzman*, 591 F.3d at 90-91. "Congress's goal was not simply to require sex offenders to register or to penalize the failure to do so," but instead "to make sure sex offenders could not avoid all registration requirements just by moving to another state." *Id.* at 91. The court in *Guzman* concluded that

> [r]equiring sex offenders to update their registrations due to intrastate changes of address or employment status is a perfectly logical way to help ensure that states will more effectively be able to track sex offenders when they do cross state lines. To the extent that § 16913 regulates solely intrastate activity, its means 'are reasonably adapted to the attainment of a legitimate end under the commerce power,' and therefore proper.

*Id.* (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)) (further internal quotation marks and citation omitted).

The Fifth Circuit concluded that § 2250 and § 16913 "are clearly complementary: without § 2250, § 16913 lacks federal criminal enforcement, and without § 16913, § 2250 has no substance." *United States v. Whaley*, 577 F.3d 254, 259 (5th Cir. 2009). That court also recognized that SORNA was focused "on the problem of sex offenders escaping their registration requirements through interstate travel." *Id.* The court in *Whaley*

> conclude[d] that requiring sex offenders to register both before and after they travel in

16

interstate commerce – which clearly facilitates monitoring those movements and which has a minimal practical impact on intrastate sex offenders (who cannot be punished under federal law for failure to register unless and until they travel in interstate commerce) – is 'reasonably adapted' to the goal of ensuring that sex offenders register and update previous registrations when moving among jurisdictions.

*Id.* at 261 (footnote omitted).

Relying on *M'Culloch* and Justice Scalia's concurrence in *Raich*, the Eighth Circuit observed that

[a] narrow discussion which only analyzes § 16913 under the three categories of *Lopez* casts doubt on the constitutionality of § 16913. . . . However, an analysis of § 16913 under the broad authority granted to Congress through both the commerce clause and the enabling necessary and proper clause reveals the statute is constitutionally authorized.

*Howell*, 552 F.3d at 715, *quoted in United States v. Vasquez*, 611 F.3d 325, 330 (7th Cir. 2010) (upholding the constitutionality of § 16913). The court in *Howell* determined that "SORNA was intended to regulate the interstate movement of sex offenders" and that § 16913 was "a reasonable means to track those offenders if they move across state lines." *Id.* at 717; *see also Vasquez*, 611 F.3d at 331; *United States v. Ambert*, 561 F.3d 1202, 1212 (11th Cir. 2009) ("Section 16913 is reasonably adapted to the attainment of a legitimate end under the commerce clause. The requirement that sex offenders register under § 16913 is necessary to track those offenders who move from jurisdiction to jurisdiction."). Pendleton cites, and we have found, no court of appeals that supports his argument that § 16913 is unconstitutional.

The reasoning in the cases we have discussed above is congruous with our decision in *Shenandoah*, and we join our

sister courts of appeals in holding that § 16913 "is a law made in pursuance of the constitution," *M'Culloch*, 17 U.S. at 424, because it is "necessary and proper for carrying into Execution" Congress's power under the Commerce Clause, U.S. Const. art. I, § 8, cl. 18.

## IV.    CONCLUSION

We will affirm the judgment of conviction.