**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2324
_____

UNITED STATES OF AMERICA

v.

KEITH ALLEN COOPER,
Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
District Court  No. 1-12-cr-00067-001
District Judge: The Honorable Richard G. Andrews

Argued January 8, 2014
Before: SMITH, SHWARTZ, and SCIRICA,
*Circuit Judges*

(Filed:  April 10, 2014)

Ilana H. Eisenstein     [ARGUED]
Edward J. McAndrew
Office of the United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE  19899
        *Counsel for Appellee*

Edson A. Bostic
Daniel I. Siegel     [ARGUED]
Office of Federal Public Defender
800 King Street
Suite 200
Wilmington, DE  19801
        *Counsel for Appellant*

Peter Goldberger
50 Rittenhouse Place
Ardmore, PA  19003
        *Counsel for Amicus Appellant*

_____

OPINION
_____

SMITH, *Circuit Judge.*

Keith Allen Cooper ("Cooper") is a sex offender who was convicted of rape in Oklahoma and paroled

2

prior to the enactment of the Sex Offender Registration and Notification Act ("SORNA" or the "Act"), Pub. L. No. 109-248, 120 Stat. 587, 590–611 (2006) (codified primarily at 18 U.S.C. § 2250 & 42 U.S.C. § 16901 *et seq.*). After Congress enacted SORNA, Cooper was convicted of failing to comply with the sex offender registration requirements set forth in SORNA. In bringing this appeal, Cooper invokes the nondelegation doctrine, challenging the constitutionality of the provision of SORNA in which Congress delegated to the Attorney General the authority to determine the applicability of the Act's registration requirements to pre-SORNA sex offenders.

We conclude that SORNA does not violate the nondelegation doctrine. Accordingly, we will affirm Cooper's conviction.

# I

In 1999, Cooper was convicted in Oklahoma state court on three counts of rape in the first degree. Cooper was paroled in January 2006. As required by pre-SORNA law, he registered as a sex offender in Oklahoma on or around January 20, 2006.

In July 2006, Congress enacted SORNA, which requires sex offenders to comply with specific registration requirements and to update registration information in the event of a change of name, address,

3

employment, or student status. Pursuant to the promulgation of an administrative rule on February 28, 2007, and subsequent issuance of a final rule, the Attorney General made SORNA's registration requirements applicable to individuals (such as Cooper) who were convicted of sex offenses prior to the enactment of SORNA.

In or around early 2011, Cooper moved from Oklahoma to Delaware. Although SORNA required Cooper to notify authorities of this change in residence, Cooper did not provide either Oklahoma or Delaware authorities with his updated residence information, nor did he separately register as a sex offender in Delaware after moving there.

In 2012, Cooper was arrested and charged with one count of failure to register as a sex offender, in violation of 18 U.S.C. § 2250(a), in the United States District Court for the District of Delaware. On November 2, 2012, Cooper moved to dismiss the indictment on the basis that, *inter alia*, SORNA's delegation of authority to the Attorney General to determine the applicability of the Act's registration requirements to pre-SORNA sex offenders violates the nondelegation doctrine and thus is unconstitutional. The District Court denied Cooper's motion to dismiss.

Cooper pled guilty but reserved his right to appeal from the denial of the motion to dismiss. The District

Court sentenced him to eighteen months' imprisonment, ten years of supervised release, and a special assessment of $100.00. Cooper then brought this timely appeal.

**II**

Congress enacted SORNA as Title I of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, §§ 101-155, 120 Stat. 587, 590-611 (2006). As set forth in the statute's declaration of purpose, Congress enacted SORNA "to protect the public from sex offenders and offenders against children" by "establish[ing] a comprehensive national system for the registration of [sex] offenders." 42 U.S.C. § 16901. SORNA "reflects Congress' awareness that pre-Act registration law consisted of a patchwork of federal and 50 individual state registration systems." *Reynolds v. United States*, 132 S. Ct. 975, 978 (2012). Thus, "[t]he SORNA reforms are generally designed to strengthen and increase the effectiveness of sex offender registration and notification for the protection of the public, and to eliminate potential gaps and loopholes under the pre-existing standards by means of which sex offenders could attempt to evade registration requirements or the consequences of registration violations." The National Guidelines for Sex Offender Registration and Notification, 72 Fed. Reg. 30210-01, 30210 (May 30, 2007).

SORNA specifies that all sex offenders "shall

register, and keep the registration current," in each state where the offender lives, works, or attends school. 42 U.S.C. § 16913(a). When an offender changes his name, residence, employment, or student status, within three business days the offender is required to appear in person in at least one jurisdiction where the offender lives, works, or is a student to notify that jurisdiction of the change in registration information. 42 U.S.C. § 16913(c). SORNA requires that the jurisdiction receiving this information immediately provide it to all other jurisdictions in which the offender is required to register in order to achieve a comprehensive national registry. *Id.*

Relevant to this appeal, SORNA makes it a federal crime for any person who is required to register, and who travels in interstate or foreign commerce, to knowingly fail to register or to update registration. 18 U.S.C. § 2250(a).[1] Once a sex offender is subject to SORNA's

---

[1]    18 U.S.C. § 2250(a) provides:

registration requirements, that offender can be convicted under § 2250 if he thereafter engages in interstate or foreign travel and then fails to register. *See Carr v. United States*, 560 U.S. 438, 447 (2010).

The statute defines "sex offender" to include individuals who were convicted of sex offenses prior to the enactment of SORNA. 42 U.S.C. § 16911(1) (defining "sex offender" as "an individual who was convicted of a sex offense"); *see also Reynolds*, 132 S. Ct. at 978 (noting that SORNA "defines the term 'sex offender' as including these pre-Act offenders"). However, SORNA does not set forth the registration

> Whoever (1) is required to register under the Sex Offender Registration and Notification Act; (2)(A) is a sex offender as defined for the purposes of the Sex Offender Registration and Notification Act by reason of a conviction under Federal law (including the Uniform Code of Military Justice), the law of the District of Columbia, Indian tribal law, or the law of any territory or possession of the United States; or (B) travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country; and (3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act; shall be fined under this title or imprisoned not more than 10 years, or both.

procedures for pre-SORNA sex offenders. Instead, in 42 U.S.C. § 16913(d), Congress delegated to the United States Attorney General the authority to determine whether SORNA's registration requirements would apply retroactively to pre-SORNA sex offenders. Section 16913(d) provides:

> The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders . . . .

42 U.S.C. § 16913(d).

On February 28, 2007, pursuant to the authority delegated to it by § 16913(d), the Attorney General issued an immediately effective rule establishing that "[t]he requirements [of SORNA] apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of the Act." Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894-01, 8897 (Feb. 28, 2007) (codified at 28 C.F.R. § 72.3). The Attorney General subsequently issued proposed guidelines for the interpretation and implementation of SORNA on May 30, 2007, reiterating that SORNA's

8

registration requirements apply retroactively to pre-SORNA offenders. *See* The National Guidelines for Sex Offender Registration and Notification, 72 Fed. Reg. 30210-01, 30212 (May 30, 2007). Additional rules, repeating that SORNA's registration requirements apply to pre-SORNA sex offenders, were promulgated on July 2, 2008. *See* The National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38030-01, 38035–36 (July 2, 2008). The Attorney General subsequently issued a Final Rule, which became effective as of January 28, 2011. *See* Applicability of the Sex Offender Registration and Notification Act, 75 Fed. Reg. 81849-01 (Dec. 29, 2010).[2]

## III

The District Court had original jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over this challenge to the constitutionality of SORNA. *United States v.*

---

[2] Cooper does not contest that by the time he moved to Delaware in or around early 2011, the Attorney General had validly promulgated rules requiring pre-SORNA sex offenders to register and keep their registration current. Cooper challenges only the constitutionality of the section of SORNA that delegated the authority to promulgate such rules to the Attorney General.

*Pendleton*, 636 F.3d 78, 82 (3d Cir. 2011).

**IV**

Cooper's sole argument on appeal is that his conviction should be vacated because Congress violated the nondelegation doctrine when it delegated its authority to the Attorney General to determine the applicability of SORNA's registration requirements to pre-SORNA sex offenders. *See* 42 U.S.C. § 16913(d).

The nondelegation doctrine "is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Article I, Section 1 of the Constitution provides: "All legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. Thus, to safeguard the separation of powers enshrined in the Constitution, "'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta*, 488 U.S. at 371–72 (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

Yet the history of the nondelegation doctrine reveals a wide gulf between the considerations rooted in the text of the Constitution and the jurisprudence that has since developed in the courts. In one of the first cases to give significant attention to the issue, *Wayman v.*

10

*Southard*, 23 U.S. 1 (1825), the Supreme Court considered a constitutional challenge to Congress' delegation to the judicial branch of authority to establish procedural rules for service of process and execution of judgments. Upholding the constitutionality of this delegation, Chief Justice Marshall distinguished between the nondelegable "powers which are strictly and exclusively legislative" and "those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *Id.* at 42–43. Marshall's opinion noted also that the line between the delegable and nondelegable powers of Congress "has not been exactly drawn," *id.* at 43, concluding that the delegation in that suit did not implicate impermissible delegation of Congress' legislative powers.

A similar analysis is found in *Field v. Clark*, 143 U.S. 649 (1892). That case involved a challenge to the constitutionality of an act authorizing the President to suspend tariff provisions for duty-free importation of certain goods in the event the President determined that such action was necessary to ensure reciprocal trade with foreign nations. The Supreme Court again recognized the importance of the prohibition against delegation of legislative power as essential to constitutional separation of powers. *Id.* at 692. However, the Court reasoned that the delegation raised no constitutional violation because the President was acting only as "the mere agent of the

11

law-making department to ascertain and declare the event upon which [Congress'] expressed will was to take effect." *Id.* at 693.

*United States v. Grimaud*, 220 U.S. 506 (1911), involved a nondelegation doctrine challenge to an act authorizing the executive branch to make regulations for the use and occupancy of forest reservations. Defendants were charged with violating regulations promulgated by the Secretary of Agriculture prohibiting the grazing of sheep on reservation land without permit. Upholding the delegation, the Court held:

> From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done.

*Id.* at 517. Thus, where a violation of an offense has been made punishable by Congress, the Court concluded, there is no constitutional violation in the coordinate branch establishing regulations governing implementation and execution of the law, so long as the coordinate branch "confin[es itself] within the field covered by the statute . . . in order to administer the law and carry the statute into effect." *Id.* at 518.

From these early cases, the modern nondelegation doctrine took shape in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). In *Hampton*, the Supreme Court considered a challenge to the constitutionality of a tariff act in which Congress delegated to the executive branch the authority to modify tariff levels when the President determined that prevailing rates were unequal between the United States and foreign countries. Upholding the constitutionality of the act, the Court emphasized the value of delegation of authority for the efficient operation of government. Nonetheless, the Court held that such delegated authority must be constrained by "defined limits, to secure the exact effect intended by [Congress'] acts of legislation," and "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." *Id.* at 406. In order to guide this analysis, *Hampton* established what became known as the "intelligible principle" test: "If Congress shall lay down by legislative act an

intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at 409. The Court determined that the delegation in that case raised no constitutional problem, because the act merely authorized the President to carry out the purpose established by Congress and provided the Executive with an intelligible principle to guide this execution.

On only two occasions has the Court invalidated legislation based on the nondelegation doctrine, and both occurred in 1935.[3] First, in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (Hughes, C.J.), the Court invalidated Section 9(c) of the National Industrial Recovery Act of 1933, which authorized the President to prohibit the shipment of oil produced in excess of state-imposed quotas. The Court held that this portion of the Act was an impermissible delegation because it lacked any standard whatsoever to limit the President's discretion:

> Section 9(c) does not state whether or in what circumstances or under what conditions the President is to prohibit the

---

[3] Thus, it has been said that the nondelegation doctrine "has had one good year, and 211 bad ones (and counting)." Cass Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 322 (2000).

14

transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in section 9(c) thus declares no policy as to the transportation of the excess production. So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment.

*Id.* at 415. The Court concluded that this provision of the Act violated the constitutional maxim that "Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested," *id.* at 421, because it provided no guidance whatsoever to limit the discretion of the President in executing the power delegated to him. *Id.* at 430.

Similarly, in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (Hughes, C.J.), the Court struck down Section 3 of the National Industrial Recovery Act, which authorized the President to approve "codes of fair competition" for trades or industries, as an unconstitutional delegation of authority. The Court

15

emphasized that the statute completely failed to define "fair competition" and thus impermissibly transferred to the executive branch the power to create law: "Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." *Id.* at 537–38.

*Panama Refining* and *Schechter Poultry* establish the "outer limits of [the] nondelegation precedents." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001). These decisions make clear that Congress cannot "provide[] literally no guidance for the exercise of discretion" and cannot "confer[] authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Id.*

But however bold these decisions may have been, they failed to alter the trajectory of the nondelegation doctrine. Shortly after the Hughes Court gave way to the Stone Court,[4] the case of *Yakus v. United States*, 321 U.S. 414 (1944), upheld a delegation to the Price Administrator (an executive official appointed by the President) to fix commodity prices at a "generally fair

---

[4]  Chief Justice Hughes retired, and former Associate Justice Harlan Fiske Stone succeeded him as Chief Justice, in 1941.

16

and equitable" level to effectuate the objectives of the Emergency Price Control Act. The Court noted that Congress had enacted the Emergency Price Control Act "in pursuance of a defined policy and required that the prices fixed by the Administrator should further that policy and conform to standards prescribed by the Act." *Id.* at 423. Distinguishing *Schechter Poultry*, which prescribed no method for attaining the objective sought by Congress, the majority concluded that "Congress has stated the legislative objective, has prescribed the method of achieving that objective . . . and has laid down standards to guide the administrative determination" in exercising the delegated authority. *Id.* at 423. Further, the Court announced that invalidation of the delegation would only be proper if the act had a total "absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed . . . ." *Id.* at 426.

Writing in dissent, Justice Owen Roberts argued that the statute in *Yakus* was an unconstitutional delegation of congressional power. In Justice Roberts's view, "the Act sets no limits upon the discretion or judgment of the Administrator. His commission is to take any action with respect to prices which he believes will preserve what he deems a sound economy . . . ." *Yakus*, 321 U.S. at 451 (Roberts, J., dissenting). Justice Roberts plaintively argued that, in effect, the majority's decision

"le[ft] no doubt that [*Schechter Poultry*] is now overruled." *Id.* at 452 (Roberts, J., dissenting). However, the fate of *Schechter Poultry* that Justice Roberts predicted did not come to pass. The Supreme Court's continued attention to *Panama Refining* and *Schechter Poultry* signals that—while their continued existence is hardly robust—they nonetheless have continuing precedential force. *See, e.g., Whitman*, 531 U.S. at 474–75; *Mistretta*, 488 U.S. at 373 n.7.

In a similar move away from *Panama Refining* and *Schechter Poultry*, *American Power & Light Co. v. Securities & Exchange Comm'n*, 329 U.S. 90 (1946), addressed a nondelegation challenge to Section 11 of the Public Utility Holding Company Act, which authorized the Securities and Exchange Commission to require companies to take steps the Commission deemed necessary to prevent holding companies from "unduly or unnecessarily complicat[ing] the [holding-company system] structure" or "unfairly or inequitably distribut[ing] voting power among security holders." *Id.* at 97. Rejecting the contention that these phrases had no meaning (and thus provided no directives to guide the delegation of authority), the Court suggested that the larger context of the act itself could imbue these terms with sufficient meaning to guide the Commission, *i.e.* these terms "derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." *Id.* at 104.

18

Looking to the "express recital of evils" in the earliest sections of the statute, the policy declarations set forth by Congress, and standards and conditions established in sections of the statute apart from Section 11, the Court concluded "a veritable code of rules reveals itself for the Commission to follow in giving effect to the standards of § 11(b)(2)." *Id.* at 105. Driven by a recognition that "judicial approval accorded these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems," *id.*, the Court determined that the statute posed no nondelegation problem.

The Supreme Court has not invalidated a statute for violating the nondelegation doctrine in the nearly 80 years since *Panama Refining* and *Schechter Poultry*. In *Mistretta v. United States*, 488 U.S. 361 (1989), a criminal defendant challenged the constitutionality of Congress' delegation of authority to the Sentencing Commission to promulgate determinative-sentence guidelines. The Court upheld this delegation on the basis of the intelligible principle test. *Id.* at 372–74. *Mistretta* reiterated that, in a modern society, delegations of authority are necessary to accommodate the technical and complex decisions that can accompany the implementation of legislation. *Id*. at 372. Upholding the delegation, the Court concluded that the grant of authority to the Sentencing Commission contained sufficient guidance and details in order to pass

constitutional muster. *Id.* at 374.

Under modern application of the nondelegation doctrine, as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (quoting *Hampton*, 276 U.S. at 406) (brackets omitted); *see also Whitman*, 531 U.S. at 472 (2001) (noting that Congress may not abdicate legislative power, but specifying that Congress may delegate "decisionmaking authority" to a coordinate branch of government as long as Congress lays down by legislative act an intelligible principle to which the coordinate branch is directed to conform). Under this test, a delegation is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73 (quoting *American Power & Light Co.*, 329 U.S. at 105). Thus, the Supreme Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

# V

## A. Cooper Urges Application of a "Meaningfully Constrains" Standard

Cooper argues that we should move the nondelegation jurisprudence in a new direction. Relying on *Touby v. United States*, 500 U.S. 160 (1991), and *United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011), Cooper urges us to apply a heightened "meaningfully constrains" standard to assess the delegation to the Attorney General in SORNA, arguing that a more rigorous standard must apply when Congress delegates discretion to impose criminal liability.

Whatever benefits may inhere in a heightened standard for cases in which Congress delegates authority to create criminal liability, we are mindful that the Supreme Court "has expressly refrained from deciding whether Congress must provide stricter guidance than a mere 'intelligible principle' when authorizing the Executive 'to promulgate regulations that contemplate criminal sanctions.'" *Amirnazmi*, 645 F.3d at 575 (quoting *Touby*, 500 U.S. at 165–66). The "meaningfully constrains" standard has been referenced in only a handful of cases, none of which set forth factors or a substantive analytical framework against which to assess whether a specific delegation satisfies that standard. In *Amirnazmi*, we did not resolve "the unsettled question of whether something more demanding than an 'intelligible

principle' is necessitated within the context of delegating authority to define criminal conduct." *Id.* at 577. We likewise decline to do so here. Until the Supreme Court gives us clear guidance to the contrary, we assess the delegation of authority to the Attorney General in 42 U.S.C. § 16913(d) under an intelligible principle standard.

**B.      Analysis Under the Intelligible Principle Test**

Applying the intelligible principle test, we conclude that Congress did not violate the nondelegation doctrine in delegating responsibility to the Attorney General to determine the applicability of SORNA's registration requirements for pre-Act offenders in 42 U.S.C. § 16913(d). In enacting SORNA, Congress laid out the general policy, the public agency to apply this policy, and the boundaries of the delegated authority. This is all that is required under the modern nondelegation jurisprudence. *Mistretta*, 488 U.S. at 372–73.

SORNA contains a general policy goal to guide the Attorney General in applying the discretion delegated by the Act. The first section of SORNA makes clear that the Act's aim is to establish a comprehensive national sex offender registry in order to protect children and the public at large from sex offenders. 42 U.S.C. § 16901. The Attorney General's discretion, established in

22

§ 16913(d), is governed by this general policy statement.[5] Although we acknowledge that SORNA's policy statement is broad and does not contain directives specifically aimed at the Attorney General, review of the history of the nondelegation doctrine reveals that far less precise policy statements have still passed muster. *See, e.g., American Power & Light Co.*, 329 U.S. at 105;

---

[5]　We do not agree with the argument made by Cooper and the Amicus Curiae that our decision in *United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013), indicates that SORNA's general policy rationale is constitutionally insufficient. In *Reynolds*, we determined that the Attorney General failed to show good cause for waiving the Administrative Procedure Act's notice and comment requirements in the issuance of the interim rule regarding retroactivity of SORNA's registration requirements in February 2007. In so holding, we noted that the Attorney General's restatement of SORNA's public safety rationale by itself did not constitute good cause to ignore the advance comment period required by the Administrative Procedure Act. *Id.* at 512. Our reasoning in *Reynolds* is not directly applicable to this appeal. Here we assess the constitutionality of SORNA in light of Supreme Court precedent on the nondelegation doctrine. Thus, we decline to deviate from that precedent based on our discussion in *Reynolds* of the Attorney General's action in issuing rules under the Administrative Procedure Act.

*Yakus*, 321 U.S. at 420–23.

Second, the intelligible principle test requires that Congress identify the recipient of the delegated authority. Section 16913(d) unambiguously designates the Attorney General as the recipient of the delegation. 42 U.S.C. § 16913(d).

Finally, while § 16913(d) itself contains no limitations on the Attorney General's discretion, we understand the discretion delegated to the Attorney General in § 16913(d) to be constrained by the legislative determinations that Congress made in other sections of SORNA. *See American Power & Light Co.*, 329 U.S. at 104–05. In SORNA, Congress identified the crimes that require registration, 42 U.S.C. § 16911; where the offender must register, 42 U.S.C. § 16913(a); the time period in which registration must be completed, 42 U.S.C. § 16913(b); the method of registration, 42 U.S.C. § 16913(b)-(c); the information that sex offenders must provide in order to register, 42 U.S.C. § 16914(a); and the elements of the crime of failure to register, 28 U.S.C. § 2250. Further, the boundaries of the Attorney General's authority are constrained by the task delegated by Congress. In responding to the directive in Section 16913(d), the Attorney General can only determine the specific question of whether SORNA's registration requirements apply to pre-SORNA sex offenders.

24

# VI

It may well be, as Justice Scalia has written, that in delegating this responsibility to the Attorney General, Congress "sail[ed] close to the wind with regard to the principle that legislative powers are nondelegable." *Reynolds v. United States*, 132 S. Ct. 975, 986 (2012) (Scalia, J., dissenting). Indeed, we are puzzled as to why Congress decided to delegate to the Attorney General the authority to determine the applicability of SORNA's registration requirements to pre-SORNA offenders. The decision to make SORNA's registration requirements applicable to pre-Act offenders is a weighty one— particularly for the class of pre-SORNA offenders affected by that decision. Although we find Congress' delegation of this important decision curious at best, we hold that it does not amount to an unconstitutional abdication.

Under controlling nondelegation doctrine jurisprudence, the hurdle for the government in this case is not high.[6] Applying the precedential authority on the

---

[6] Each of our sister circuits to have considered the issue has concluded that SORNA does not violate the nondelegation doctrine. *See, e.g., United States v. Goodwin*, 717 F.3d 511, 516–17 (7th Cir. 2013), *cert. denied*, __ U.S. __, 134 S. Ct. 334 (2013); *United States v. Kuehl*, 706 F.3d 917, 919–20 (8th Cir. 2013); *United States v. Parks*, 698 F.3d 1, 7–8 (1st Cir. 2012), *cert.*

nondelegation doctrine, we conclude that SORNA's delegation to the Attorney General in 42 U.S.C. § 16913(d) does not violate the nondelegation doctrine. Accordingly, we will affirm.

---

*denied*, __ U.S. __, 133 S. Ct. 2021 (2013); *United States v. Rogers*, 468 F. App'x 359, 362 (4th Cir. 2012) (not precedential), *cert. denied*, 133 S. Ct. 157 (2012); *United States v. Felts*, 674 F.3d 599, 606 (6th Cir. 2012); *United States v. Guzman*, 591 F.3d 83, 92–93 (2d Cir. 2010), *cert. denied*, 130 S. Ct. 3487 (2010); *United States v. Whaley*, 577 F.3d 254, 263–64 (5th Cir. 2009); *United States v. Ambert*, 561 F.3d 1202, 1213–14 (11th Cir. 2009).

26