**F I L E D**

**PUBLISH**

**June 5, 2007**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NADINE GILLMOR, individually and
as trustee of the Nadine Fausett
Gillmor Trust; MILTON O. BITNER
COMPANY, a Utah corporation;
EVERGREEN DEVELOPMENT, a
Utah limited partnership; ELLA M.
PACE, an individual; DWAYNE M.
PACE, a trustee of the Dwayne M.
Pace Revocable Trust; JOAN J. PACE,
trustee of the Joan J. Pace Revocable
Trust; GALE W. PACE, an individual;
KATHLEEN D. PACE, an individual;
and ANDERSON DEVELOPMENT,
LLC, a Utah limited liability company,

     Plaintiffs-Appellants,

v.

DAVID L. THOMAS; DAVID
ALLEN; MICHAEL BARILLE;
SHAUNA KERR; BOB RICHER;
KENNETH WOOLSTENHULME;
TOM BRENNAN; CYNTHIA
CALLAWAY; MAX GREENHALGH;
BRUCE TAYLOR; DONNA VAN
BUREN; and MIKE WASHINGTON,
as individuals,

     Defendants-Appellees.

No. 06-4124

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:05-CV-823-PGC)

Bruce R. Baird (Alain C. Balmanno with him on the briefs), Hutchings, Baird, & Jones PLLC, Salt Lake City, Utah for the Plaintiffs-Appellants.

Jody K. Burnett (George A. Hunt and Robert C. Keller, Williams & Hunt; and Steven W. Allred, Woolsternhulme, Kerr and Richer, Salt Lake City, Utah, with her on the briefs), Williams & Hunt, Salt Lake City, Utah for the Defendants-Appellees.

---

Before **LUCERO**, **MURPHY**, Circuit Judges, and **ROBINSON**,[*] District Judge.

---

**LUCERO**, Circuit Judge.

This case presents the latest battle in a legal war being waged by several landowners against Summit County, Utah and its zoning regime. Landowners[1] brought suit against several County Officials[2] alleging that their administration of

---

[*] The Honorable Julie A. Robinson, United States District Court Judge, District of Kansas, sitting by designation.

[1] "Landowners" refers collectively to: Nadine Gillmor (individually and as trustee of the Nadine Fausett Gillmor Trust), the Milton O. Bitner Company, Evergreen Development, Ella M. Pace, Dwayne M. Pace (as trustee of the Dwayne M. Pace Revocable Trust), Joan J. Pace (as trustee of the Joan J. Pace Revocable Trust), Gale W. Pace, Katherine D. Pace, and Anderson Development, LLC.

[2] "County Officials" refers collectively to: David L. Thomas, Chief Deputy County Attorney for Summit County; David Allen, Director of the Summit County Department of Community Development; Michael Barille, Planning Director of the Summit County Department of Community Development; Bob Richer, Kenneth Woolstenhulme, and Shauna Kerr, members of the Board of County Commissioners of Summit County; Tom Brennan, Cynthia Callaway, Bruce Taylor, and Michael Washington, members of the Snyderville Basin

(continued...)

Summit County's zoning ordinances constitutes a pattern of extortion in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Concluding that County Officials had committed no illegal predicate acts as required to support a RICO claim, the district court granted summary judgment against Landowners and dismissed their case. We **AFFIRM**.

**I**

Summit County's zoning scheme is administered by the Board of County Commissioners ("BCC"). BCC Commissioners, of whom there are three, are elected officials who serve four-year terms. In 1995, the BCC passed County Ordinance No. 268, establishing the Snyderville Basin as an independent planning district, and creating the Snyderville Basin Planning Commission ("SBPC"). The SBPC's seven members are appointed by the BCC and serve at that body's pleasure. Although the SBPC has the power to approve some plans, the BCC holds final authority over more complex developments. In 1997, after numerous public hearings were held by the SBPC and the BCC, the BCC adopted County Ordinance No. 321, establishing a new General Plan for zoning in the Snyderville Basin. Following additional public input, the BCC passed a comprehensive Development Code in 1998. Both the General Plan and the Development Code

[2](...continued)
Planning Commission; and Max Greenhalgh and Donna Van Buren, former members of the Snyderville Basin Planning Commission.

were amended in 2004, but maintain the characteristics with which Landowners take issue.

As codified in the General Plan and Development Code, Summit County employs a "performance zoning" or "incentive zoning" system. Under this system, a relatively low "base density" has been established throughout the Snyderville Basin, generally allowing developments of less than one unit per 20 acres. On lands designated "environmentally sensitive," development is limited to one unit per 40 acres. By maintaining low base densities, the County aims to preserve "a lifestyle that is based principally on mountain, resort, and recreation qualities; and where preservation and stewardship of the Basin's natural resources and scenic qualities are paramount." Concentrated nodes of high-density development are permitted at "appropriate locations."

Overlaying these base entitlements is a "Development Potential Matrix" ("Matrix"), by which:

> Summit County will offer reasonable density incentives for projects which further promote the goals and objectives of [the General] Plan, thereby producing tangible community benefits. Density incentives will be considered for appropriate: a) environmental enhancements; b) tax base and economic enhancements; c) transfer of development rights from less desirable development sites to more appropriate sites; d) public facilities and amenities that exceed a specific project [sic] requirements; e) open space that exceed [sic] project requirements; f) restricted affordable housing; and g) compliance with appropriate design principles.

- 4 -

By entering into voluntary development agreements, developers are permitted to build at densities that would not otherwise be permitted – in some cases up to five units per acre. In exchange for density bonuses, local developers have offered a variety of contributions, including: conservation easements, school funding, new public trails, increased open space, wetlands preservation, and new public parks. BCC development agreements typically include a provision forbidding the developer from participating in any legal challenge to the County's zoning ordinances.

Landowners have brought three separate lawsuits challenging the validity of this zoning scheme in Utah state court: Gillmor v. Summit County, No. 040500427; Evergreen Dev. v. Summit County, No. 050500059; and Evergreen Dev. v. Summit County, No. 050500112. On October 3, 2005, they filed a separate, 644-paragraph complaint in federal district court, alleging that County Officials engaged in a pattern of racketeering activity "through the enforcement of illegal and/or invalid general plan and zoning ordinances and other illegal practices, the imposition and collection of illegal school impact fees and the extortion of [transferable development rights], all in violation of 18 U.S.C. § 1962(c)."

In support of this claim, Landowners list 41 predicate acts of alleged racketeering. Several of these alleged predicate acts are voluntary development agreements between the County and various developers by which the County

obtained community benefits in exchange for density bonuses. None of the cited agreements involve Landowners. Among the listed predicate acts, only eight incidents involve Landowners:

(1) "Evergreen School Impact Fee Letter"[3] – On January 30, 2002, Evergreen Development ("Evergreen") submitted a Sketch Plan Form to the County regarding its proposed Quarry Meadows Subdivision. Sometime thereafter, Chief Deputy County Attorney David L. Thomas met with counsel for Evergreen. Following that meeting, Thomas sent a letter to counsel addressing two issues: Whether the sketch plan resulted in vesting of the 1998 ordinance; and whether the County could restrict the development to fewer than 36 units when it had previously approved a total of 36 unites at a similar development, named Quarry Mountain Ranch. Thomas listed 12 differences between the two developments, including the following: "Quarry Mountain developed a school bus stop. Quarry Mountain is offering a school contribution. These are two different ways of addressing school impacts."

(2) "Gillmor Statement" – In the July 1, 2004 edition of the Salt Lake City Tribune, Thomas is quoted as stating that the County's Development Code "is fair, rational and legal and we will defend it."

---

[3] For the sake of clarity we adopt the titles given to the alleged predicate acts by Landowners, despite their questionable accuracy.

(3) "DCD/Evergreen Meeting" – David Allen, Director of the Department of Community Development, Michael Barille, Planning Director of the Department of Community Development, and William Pratt, County Planner, met with Evergreen representatives in February 2003, to discuss the Quarry Meadows application. In that meeting, Allen and Barille explained that in order to develop beyond the property's base density, the developers would likely need to provide additional community and recreational benefits.

(4) Quarry Meadows "Work Sessions" – On April 22, 2003 and again on August 26, 2003, Evergreen representatives met with SBPC and its staff regarding the Quarry Meadows proposal. At both meetings, the commissioners indicated that additional community and neighborhood benefits would be necessary to achieve approval of Evergreen's desired density bonuses. At the first meeting, commissioners also questioned whether Evergreen's proposed school contribution was sufficient to justify its desired density bonuses.

(5) "Quarry Meadows Staff Report" – On August 12, 2003, Pratt forwarded a staff report to the SBPC describing the Quarry Meadows Sketch Plan. The report notes that Allen and Barille raised the following concerns, among others, regarding the proposed development: "the need for more community and neighborhood recreational benefits [and] the removal of major delineated wetlands from proposed lots." It also indicates that these concerns were "addressed by the applicant." Finally, the report describes the proposed

- 7 -

community and neighborhood benefits to include public trails, an enhanced stream corridor, and playground/gathering area among other benefits.

(6) "Bitner-Redhawk Letter" – On September 23, 2003, Allen responded to an inquiry from representatives of the Bitner Company regarding the development potential of the "Redhawk" parcel. That letter states:

> Without a transfer of density and assuming the design of the project meets all of the eight land use and community benefit criteria outlined in the Development Matrix, the maximum density on Parcel 9 would be 1 unit per 17.5 acres which would be approximately 7 units (this also assumes there are no sensitive lands on the parcel). While this may appear to be low, density, it is my understanding that adjacent parcels in Morgan County are zoned 1 unit per 160 acres.
>
> Hopefully this helps you understand my initial reading of the documents and Development Code as it relates to these two parcels. I would be glad to further discuss this with you if needed.

Landowners do not allege that this statement was inaccurate.

(7) "Pace Meeting" – In the Spring of 2004, Ella M. Pace and a real estate broker representing the Pace family met with Barille and Allen to discuss the development potential of Pace's property. At that meeting, Barille correctly stated that under the Development Code's base-density allowance, the parcel could be developed with no more than eight single-family units. He further informed them that the wetlands portion of the property would have to be maintained as open space, which Landowners contend is contrary to the Code's text.

(8) "Denial Letter" – On November 3, 2004, Anderson Development, LLC, on behalf of several Landowners, submitted applications to develop several properties. Nadine Gillmor did the same. Attached to these applications were letters asserting that Summit County's Development Code is unconstitutional, and violates both state and federal law. In the absence of valid zoning regulations, the letters continued, the County was required to approve the applications as long as they conform to state law. Allen responded with a letter noting that the zoning regulations were legally adopted and continued to be in effect. Because Landowners' applications did not comply with the applicable regulations, Allen informed them that their applications could not be processed.

On December 27, 2005, County Officials filed a motion for summary judgment, arguing: (1) Landowners could not prove the existence of any predicate acts; (2) Landowners lacked RICO standing; (3) County Officials held absolute immunity from suit; and (4) County Officials held qualified immunity from suit. In its response, Landowners stated: "Plaintiffs' challenge to the zoning and development plans and codes is another case in another court. . . . The challenges Plaintiffs have raised in other courts to the invalidity, illegality and unconstitutionality of the codes and plans are not before this Court for decision." On April 11, 2005, the district court held a summary judgment hearing. Attempting to clarify Landowner's argument, the following exchange took place:

[Counsel for Landowners]: We're not asking you to rule on the zoning code and to get into the weeds of the zoning code. This isn't a case where we're saying, gee, this is roughly proportional or it isn't. We've given you examples, your Honor and –

The Court: Let me make sure I understand that. As I understand it from your brief, you're not asking me to rule on the legality or illegality of the codes or plans or things like that that are involved in this case.

[Counsel for Landowners]: That's correct.

Finding that no court had ruled the relevant zoning ordinances to be illegal or unconstitutional, and that Landowners had waived such a challenge in the instant case, the district court concluded that Landowners had presented no predicate acts to support a RICO claim. Accordingly, it orally granted summary judgment in favor of County Officials. Landowners now appeal from that order.

**II**

We first address whether Landowners had standing to bring their RICO claim. Although the district court did not address the issue, we are under a continuing obligation to ensure that the district court had jurisdiction over the case as an initial matter. See Local 514 Transp. Workers Union of Am. v. Keating, 358 F.3d 743, 749 n.6 (10th Cir. 2004) In order to bring a RICO claim, a plaintiff must allege a violation of 18 U.S.C. § 1962, which consists of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted). A "pattern of racketeering activity" must include at

least two predicate acts.  Deck v. Engineered Laminates, 349 F.3d 1253, 1257

(10th Cir. 2003).  Additionally, "a plaintiff has standing to bring a RICO claim

only if he was injured in his business or property by reason of the defendant's

violation of § 1962."  Id.

In their complaint, landowners describe the allegedly extortionate conduct

of a "County Enterprise" in no small amount of detail.  Although many of the acts

constituting an alleged pattern of racketeering activity involve non-parties, as

noted above, Landowners also allege several predicate acts directed toward them.

They further charge that these acts, which they characterize as attempted theft by

extortion, damaged them by reducing the development potential (and thus the

value) of their properties.  These allegations are not conclusory, nor do they

"clearly appear[] to be immaterial and made solely for the purpose of obtaining

jurisdiction."  Bell v. Hood,  327 U.S. 678, 682 (1946).  As such, they are

sufficient to confer RICO standing.[4]  County Officials' arguments to the contrary

---

[4] County Officials argue that Landowners do not have standing because the alleged RICO violations were not the proximate cause of Landowners' injuries. Absent such causation, of course, there is no standing to bring a claim.  See Deck, 349 F.3d at 1257.  Landowner's theory of causation, to the extent such a theory may be discerned from their complaint, is nebulous; this is because County Officials are not alleged to have taken definitive steps to block development of Landowners' parcels.  Nevertheless, taking Landowners' allegations to be true, we are satisfied they have met their burden of establishing a causal connection between County Officials' activities and some injury to their business or property. See Sedima, 473 U.S. at 498-99 (generally taking a liberal view of causation required to establish RICO standing, and rejecting a "racketeering injury" requirement).

go to whether the allegations are true, not whether they were sufficient to confer jurisdiction.

III

We review a grant of summary judgment de novo, applying the same legal standard used by the district court. Mountain W. Mines, Inc. v. Cleveland-Cliffs Iron Co., 470 F.3d 947, 950 (10th Cir. 2006). Summary judgment is appropriate only where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To succeed on a RICO claim, Landowners must prove: (1) conduct, (2) of an enterprise, (3) through a pattern, of (4) racketeering activity consisting of at least two predicate acts. Deck, 349 F.3d at 1257; see also Robbins v. Wilkie, 433 F.3d 755, 767 (10th Cir. 2006), cert. granted, 127 S. Ct. 722 (2006). Under 18 U.S.C. § 1961, instances of extortion or attempted extortion qualify as predicate acts. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). As the Supreme Court has noted, the Hobbs Act adopted the common law definition of extortion with respect to official misconduct. Evans v. United States, 504 U.S. 255, 263-64 (1992). Attempted extortion "under color of official right" is "a public official's attempt to obtain money not due him or his office." United States v. Troutman, 814 F.2d 1428, 1456 (10th Cir. 1987).

- 12 -

**A**

Before addressing the merits of Landowners' claim, we must determine the scope of their waiver below. We will not consider claims that were waived in the district court. O'Connor v. City & County of Denver, 894 F.2d 1210, 1214 (10th Cir. 1990). In their response to County Officials' motion for summary judgment, Landowners stated: "Plaintiffs' challenge to the zoning and development plans and codes is another case in another court. . . . The challenges Plaintiffs have raised in other courts to the invalidity, illegality, and unconstitutionality of the codes and plans are not before this Court for decision." (emphasis added). They reaffirmed this position at the summary judgment hearing. Accordingly, we will not rule on the "invalidity, illegality[, or] unconstitutionality" of Summit County's General Plan or its Development Code. As a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to the ordinances. See United States v. Pompey, 264 F.3d 1176, 1179 (10th Cir. 2001).

This holding lays waste to much of Landowners' arguments on appeal. Landowners are precluded from arguing that the zoning scheme: (1) deprives them of their Fifth Amendment rights under Dolan v. City of Tigard, 512 U.S. 374, 391 (1994), or Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987); (2) imposes unreasonable exactions in violation of Utah law, see Banberry Dev. Corp. v. S. Jordan City, 631 P.2d 899, 905 (Utah 1981); or (3) contravenes Utah

- 13 -

Code Ann. § 53A-20-100.5 by requiring school impact fees. Landowners seek to focus our attention on the acts of County Officials rather than the ordinances themselves, but we fail to see how actions taken under the direct authority, and for the purpose of enforcing a valid ordinance can possibly be deemed extortionate. We reject Landowners backdoor attempt to revivify their waived claims.

**B**

Sensing, perhaps, that the scope of their waiver creates a substantial impediment to success on their RICO claims, Landowners deploy a fallback argument. They read our recent decision in Robbins for the proposition even when an official acts with legal authority, his activities may still be extortionate. In that case, plaintiff Robbins brought a RICO claim against Bureau of Land Management ("BLM") personnel. Robbins, 433 F.3d at 767. In attempting to obtain a right-of-way for the BLM, defendants took a number of adverse actions against Robbins, including: "refusing to maintain the road providing access to Robbins' property, cancelling Robbins' special recreation use permit and grazing privileges, bringing unfounded criminal charges against Robbins, trespassing on Robbins' private property, and interfering with Robbins' guest cattle drives." Id. at 768. Defendants argued that these actions could not support a RICO claim because they had legal authority to take each of them. Rejecting this defense, we held:

> Although Defendants do not enumerate specific regulatory provisions permitting each of their actions, the regulatory authority may exist. Nevertheless, we conclude that if Defendants engaged in lawful actions with an intent to extort a right-of-way from Robbins rather than with an intent to merely carry out their regulatory duties, their conduct is actionable under RICO.

Id. (footnote omitted).

Relying on Robbins, Landowners argue that even though County Officials' actions were authorized by the zoning ordinances, their intent to extort property gives rise to RICO liability. Landowners read too much into Robbins. In that case, we noted that "Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution." Id. at 769 (emphasis added). We specifically distinguished between "merely enforcing the law" and using "otherwise lawful authority to extort." Id. at 770. Although BLM officers may have had the power to, for example, revoke Robbins' special recreation use permit, they did so for an improper purpose – to harass Robbins. It was not the use of authority we deemed wrongful, but the abuse of authority.

The present case bears little resemblance to Robbins. Whereas in that case Robbins alleged a pattern of harassing and punitive acts that were both targeted at him and well outside the bounds of normal BLM practice, County Officials merely engaged in the normal administrative duties required to enforce the zoning ordinances. Landowners do not allege that they were treated any differently than

- 15 -

other Summit County developers, all of whom are subject to the performance zoning system administered by County Officials. None of the predicate acts directed towards Landowners can be understood as "inherently wrongful" as that term is used in Robbins. 433 F.3d at 769. Most of those acts were simply County Officials explaining to Landowners either how the zoning scheme works, or rejecting allegations of the scheme's invalidity. The only act that could plausibly be called wrongful (in the sense that it was inaccurate) is Barille's statement at the Pace Meeting that wetlands areas must be maintained as open space, which Landowners contend is contrary to the ordinance's text. One isolated incident of allegedly mischaracterizing a zoning ordinance, does not, however, constitute extortion under § 1951(b)(2).

We conclude that the district court was correct in finding Landowners could not prove the existence of any predicate acts, as required by § 1961. Accordingly, summary judgment was appropriate and the case was properly dismissed. To allow Landowners to move forward on their RICO claim would provide an alternative avenue to bring a facial or an as-applied challenge to a statute's validity by alleging that officials' enforcement of that statute is extortionate. We find no basis for such an approach in RICO's text nor in the legislative history of the Act. As the district court correctly noted, such a holding would put "the cart before the horse."

**IV**

**AFFIRMED**.