**UNITED STATES COURT OF APPEALS**

**January 26, 2016**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GLEN EARL COTONUTS,

    Defendant - Appellant.

No. 13-1539
(D.C. No. 1:12-CR-00409-CMA-1)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

Defendant-Appellant Glen Earl Cotonuts was convicted for failing to register as a sex offender under the Sex Offender Registration and Notification Act ("SORNA"). 18 U.S.C. § 2250. Among other things, he was sentenced to a term of supervised release. As a condition of his supervised-release term, Mr. Cotonuts was required to submit to a penile-plethysmograph test. Mr. Cotonuts challenges his conviction, claiming that the Attorney General's authority to apply SORNA retroactively violates the nondelegation doctrine. Mr. Cotonuts also

---

[*]     This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

argues that the district court failed to make the particularized findings necessary to impose the plethysmograph supervised-release condition.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** Mr. Cotonuts's conviction. Instructed by our decision in *United States v. Nichols*, 775 F.3d 1225 (10th Cir. 2014), *cert. granted on other grounds*, --- U.S. ----, 136 S. Ct. 445 (2015), we conclude that SORNA provides a sufficiently intelligible principle to guide the Attorney General's decisionmaking. However, we do not reach the merits of Mr. Cotonuts's supervised-release challenge. More specifically, we **dismiss as moot** the sentencing portion of his appeal because Mr. Cotonuts's challenge to the plethysmograph condition ceased to be a live case or controversy when the district court revoked his original supervised-release term and imposed a new supervised-release order with facially different requirements.

**I**

Mr. Cotonuts was convicted of abusive sexual contact in 1989 and aggravated sexual abuse of a child in 1993; both offenses involved victims under the age of eight. He was classified as a Tier III sex offender and was required to register as a sex offender for life under SORNA. Mr. Cotonuts was on supervised release for the 1993 conviction between 2007 and 2011, during which time he met his SORNA registration requirement. However, in 2011, his supervision was revoked because of his alcohol abuse and failure to attend required sex-offender treatment appointments, and he was returned to prison.

2

Mr. Cotonuts completed his term of imprisonment on June 22, 2012. After being released, he moved to Towaoc, Colorado. While county officials were informed that he would be moving there after leaving prison, Mr. Cotonuts did not register in person, as SORNA requires. On August 15, 2012, a deputy marshal told Mr. Cotonuts that he was delinquent on his registration, at which point he went to the county sheriff's office and registered. Mr. Cotonuts nevertheless was subsequently charged with one count of failing to register or update his registration as a sex offender, in violation of 18 U.S.C. § 2250.

Mr. Cotonuts initially moved to dismiss the indictment, claiming that the Attorney General's authority to apply SORNA to his pre-SORNA sex-offense convictions violated the nondelegation doctrine. The district court denied this motion, concluding that the Supreme Court "has found broad policy statements [such as that articulated in SORNA] sufficient to provide an intelligible principle for delegation." R., Vol. I, at 66 (Order Den. Def.'s Mot. to Dismiss, dated Aug. 22, 2013).

Mr. Cotonuts was ultimately convicted of violating SORNA's registration requirements. The presentence investigation report ("PSR") prepared by the United States Probation Office[1] recommended that, as part of his supervised release, he complete "an approved program of sex offender evaluation and

---

[1]     The Probation Office used the 2013 edition of the United States Sentencing Guidelines in preparing the PSR. The parties do not question that choice on appeal; therefore, we reference that edition as well.

3

treatment, which may include polygraph, [penile] plethysmograph and Abel examinations, as directed by the probation officer." R., Vol. II, at 52 (PSR, filed Dec. 5, 2013).[2] Mr. Cotonuts objected to the potential use of the plethysmograph, claiming that it implicated a fundamental liberty interest and that the test was ineffective in providing treatment, protecting the public, and deterring sex crimes. The Probation Office justified the recommendation, in part, because the Colorado Sex Offender Management Board ("SOMB"), which regulates and evaluates sex offenders in Colorado, "require[s] treatment agencies to administer plethysmograph and polygraph examinations"; accordingly, the Probation Office reasoned, Mr. Cotonuts would need to agree to the plethysmograph in order to be accepted into a Colorado sex-offender treatment program. R., Vol. II, at 56.[3]

At the sentencing hearing, Mr. Cotonuts claimed that plethysmograph examinations were, in fact, not actually required by the SOMB.[4] However, as part

_____

[2]    Penile-plethysmograph examinations involve attaching a gauge to a man's genitals in order to measure his arousal in response to various visual and auditory stimuli. *See* Jason R. Odeshoo, *Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders*, 14 Temp. Pol. & Civ. Rts. L. Rev. 1, 6–9 (2004). Abel examinations involve "presenting individuals with non-erotic pictures of children and adults and determining sexual interest by measuring how long a person spends viewing each picture." *Id.* at 13.

[3]    The Probation Office's practice was to refer federal offenders ordered to participate in sex-offender treatment to programs that the SOMB had approved.

[4]    Mr. Cotonuts pointed to various parts of the SOMB Standards and Guidelines that list several options for sex offender treatment, including

(continued...)

4

of its sentence, the district court nevertheless imposed the plethysmograph condition, concluding that "[s]ex offender treatment cannot be accomplished effectively in the District of Colorado without the defendant's full participation," which "may involve plethysmograph and polygraph examinations pursuant to SOMB requirements." R., Vol. III, at 736–37 (Tr. of Sentencing Hr'g, dated Dec. 16, 2013).

The district court made two further findings to justify the imposition of this condition. First, it noted that the plethysmograph would be a "crucial resource[]" given the nature of Mr. Cotonuts's previous sex offenses against young children and the fact that he suffered from alcoholism, which made him "at high risk for sexually re-offending and other criminogenic behaviors." *Id.* at 735–36. The court expressed particular concern that Mr. Cotonuts became "impulsive and unpredictable" when intoxicated due to "his severe alcohol[ism] and limited support system." *Id.* at 736. Second, the court found that the SOMB standards were "based on the best practices known to date for managing and treating sex offenders" and were updated "based . . . on current research in the field." *Id.* at 734.

---

[4](...continued)
polygraphs, Abel examinations, and plethysmographs, in the disjunctive. The Probation Officer reaffirmed his belief that Mr. Cotonuts would not be accepted into a treatment program if the court "cherry pick[ed] . . . which [treatments] he has to have." R., Vol. III, at 733 (Tr. of Sentencing Hr'g, dated Dec. 16, 2013).

Ultimately, the court sentenced Mr. Cotonuts to twenty months' imprisonment and five years of supervised release. He filed this timely appeal.

## II

Mr. Cotonuts challenges both the constitutionality of the Attorney General's authority to make SORNA's registration requirement retroactively applicable to him, and the condition of his supervised-release term that he should undergo penile-plethysmograph testing.[5] We address these challenges in turn.

## A

In 2006, Congress enacted SORNA as part of the Adam Walsh Child Protection and Safety Act. *See* Pub. L. No. 109-248, 120 Stat. 587 (2006). The statute itself does not apply retroactively, but it does empower the Attorney General "to specify the applicability of the requirements . . . to sex offenders convicted before the [statute's] enactment." 42 U.S.C. § 16913(d). Pursuant to

---

[5] For reasons explicated *infra*, we ultimately dismiss the sentencing portion of Mr. Cotonuts's appeal regarding his supervised-release condition on mootness grounds. We note parenthetically that, though Mr. Cotonuts has completed the twenty-month prison term for his SORNA offense, the parties do not dispute, and we have no reason to question, the vitality of his appeal regarding his SORNA conviction given the usual collateral consequences engendered by a felony conviction. *See, e.g.*, *Sibron v. New York*, 392 U.S. 40, 57 (1968) (noting, in the context of a prisoner's complete service of his imprisonment sentence, that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction"); *United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000) (citing *Sibron* and noting that "[t]he reality of these substantial disabilities eventually led the [Supreme] Court to simply presume that sufficient collateral consequences exist in cases where released defendants appeal their direct convictions").

6

this statutory grant, the Attorney General promulgated regulations applying SORNA's registration requirements to offenders like Mr. Cotonuts who were convicted before SORNA was enacted. *See* 28 C.F.R. § 72.3 (2011); *see also* Applicability of the Sex Offender Registration and Notification Act, 75 Fed. Reg. 81849, 81851 (Dec. 29, 2010) (adopting the final rule and explaining that "the public safety benefits of SORNA's requirements outweigh any adverse effects" and "the public safety concerns sex offenders present, are similar, whether a sex offender's conviction occurred before or after SORNA's enactment").

Mr. Cotonuts claims that in the absence of any "intelligible principle" for how the Attorney General is to exercise his discretion in applying SORNA retroactively, Congress's delegation of the authority to do so violates the principle of separation of powers by vesting legislative power in the Executive Branch. We review this constitutional claim de novo, *see United States v. Morgan*, 748 F.3d 1024, 1030–31 (10th Cir.), *cert. denied*, --- U.S. ----, 135 S. Ct. 298 (2014), although we begin with the presumption that the statute is constitutional, *see Gillmor v. Thomas*, 490 F.3d 791, 798 (10th Cir. 2007) ("As a general matter, we give all statutes a presumption of constitutionality . . . .").

## 1

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). While the Constitution forbids Congress from

7

"delegat[ing] its legislative power to another branch of Government," it "does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches." *Touby v. United States*, 500 U.S. 160, 165 (1991). This reflects "a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372.

A delegation is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). More succinctly, in order to pass constitutional muster, a delegation from Congress to the Executive Branch must provide "an intelligible principle to which the [agency] is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The nondelegation doctrine's continuing vitality is at least open to question. Except for two decisions in 1935—*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)—the Supreme Court has never deployed the doctrine to strike down a statute on the ground that it involves an excessive delegation of authority. *See* 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance*

8

*and Procedure* § 4.8(b), at 649 n.17 (5th ed. 2012) ("The only time the Court clearly invalidated a statute for being an excessive delegation of legislative authority was 1935."). Instead, the Court has consistently found that even statutes with broad or general standards provide a sufficiently intelligible principle. *See, e.g.*, *Whitman*, 531 U.S. at 472 (involving the EPA's power to set ambient quality standards, "the attainment and maintenance of which in the judgment of the Administrator . . . are requisite to protect the public health" (quoting 42 U.S.C. § 7409(b)(1))); *Touby*, 500 U.S. at 163 (upholding the Attorney General's authority to designate a drug as a controlled substance if doing so was "necessary to avoid an imminent hazard to the public safety" (quoting 21 U.S.C. § 811(h))); *Am. Power & Light Co.*, 329 U.S. at 104 (upholding the SEC's ability to change the structure of holding companies if doing so would not be "unduly or unnecessarily complicate[d]" or "unfairly or inequitably distribute voting power"); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 215 (1943) (upholding the Federal Communications Commission's power to regulate airwaves for the "public interest, convenience, or necessity" (quoting 47 U.S.C. §§ 307(a)(d), 309(a), 310, 312)).

Thus, even though *Schechter Poultry* and *Panama Refining* remain good law, as a panel of our court noted in a persuasive unpublished decision, the doctrine has been "long-dormant." *United States v. Rickett*, 535 F. App'x 668, 675 (10th Cir. 2013) (reviewing the history of the nondelegation doctrine and

9

concluding that "the doctrine, even if dead, has never received a proper burial"), *cert. denied*, --- U.S. ----, 134 S. Ct. 1529 (2014); *see also United States v. Parks*, 698 F.3d 1, 8 (1st Cir. 2012) (observing that "modern case law tends regularly to disfavor" the nondelegation doctrine). This state of affairs reflects a tacit acknowledgment of the limits of judicial competency; the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

Indeed, today, the nondelegation doctrine is largely "limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta*, 488 U.S. at 373 n.7; *see also United States v. Fuller*, 627 F.3d 499, 512–13 (2d Cir. 2010) (Raggi, J., concurring) (construing the statutory language of SORNA to require retroactive application in order to avoid nondelegation concerns), *judgment vacated on other grounds by Fuller v. United States*, --- U.S. ----, 132 S. Ct. 1534 (2012); *United States v. Hinckley*, 550 F.3d 926, 948 (10th Cir. 2008) (Gorsuch, J., concurring) (same), *abrogated on other grounds by Reynolds v. United States*, --- U.S. ----, 132 S. Ct. 975 (2012). *See generally* John F. Manning, *The Nondelegation Doctrine as a Canon of Avoidance*, 2000 Sup. Ct. Rev. 223, 242–47 (arguing that the nondelegation

10

doctrine has been enforced by the narrow construction of statutes that may otherwise confer open-ended authority to executive agencies).

**2**

We squarely addressed whether the Attorney General's authority to apply SORNA retroactively violates the nondelegation doctrine in *Nichols*, and concluded that while "Congress's delegation of this important decision is puzzling," "it nonetheless passes constitutional muster." *Nichols*, 775 F.3d at 1232 n.3.[6] Because we are bound by our controlling decision in *Nichols*, we conclude that Mr. Cotonuts's nondelegation challenge fails. Here, we briefly

---

[6] Indeed, given that "virtually any statute will be deemed valid" under the nondelegation doctrine, *Rickett*, 535 F. App'x at 675, it is not surprising that every one of our sister circuits to consider this question has also concluded that SORNA provides a sufficiently "intelligible principle" to govern the Attorney General's discretion. *See United States v. Richardson*, 754 F.3d 1143, 1146 (9th Cir. 2014) (per curiam); *United States v. Cooper*, 750 F.3d 263, 271 (3d Cir.), *cert. denied*, ---U.S. ----, 135 S. Ct. 209 (2014); *United States v. Goodwin*, 717 F.3d 511, 516 (7th Cir.), *cert. denied*, --- U.S. ----, 134 S. Ct. 334 (2013); *United States v. Kuehl*, 706 F.3d 917, 920 (8th Cir. 2013); *Parks*, 698 F.3d at 7–8; *United States v. Felts*, 674 F.3d 599, 606 (6th Cir. 2012); *United States v. Guzman*, 591 F.3d 83, 92–93 (2d Cir. 2010); *United States v. Whaley*, 577 F.3d 254, 264 (5th Cir. 2009); *United States v. Ambert*, 561 F.3d 1202, 1214 (11th Cir. 2009). In addition, several different panels of the Fourth Circuit have rejected the claim that SORNA violates the nondelegation doctrine, but the court has not issued a published decision on this issue. *See United States v. Sampsell*, 541 F. App'x 258, 259–60 (4th Cir. 2013) (per curiam); *United States v. Atkins*, 498 F. App'x 276, 278 (4th Cir. 2012) (per curiam); *United States v. Mitchell*, 498 F. App'x 258, 260 (4th Cir. 2012) (per curiam); *United States v. Clark*, 483 F. App'x 802, 804 (4th Cir. 2012) (per curiam); *United States v. Rogers*, 468 F. App'x 359, 361–62 (4th Cir. 2012) (per curiam); *United States v. Stewart*, 461 F. App'x 349, 351 (4th Cir. 2012) (per curiam); *United States v. Burns*, 418 F. App'x 209, 211–12 (4th Cir. 2011).

review the sources we turned to in *Nichols* to glean an intelligible principle for the Attorney General to follow.

First, Congress's declaration of purpose in enacting SORNA articulates a clear goal of creating "a comprehensive national system for . . . registration" to "protect the public from sex offenders."  42 U.S.C. § 16901; *see Nichols*, 775 F.3d at 1231 ("This policy statement conveys the intelligible principles upon which the Attorney General's delegated authority must be based."); *accord United States v. Cooper*, 750 F.3d 263, 271 (3d Cir. 2014); *United States v. Goodwin*, 717 F.3d 511, 516 (7th Cir. 2013); *United States v. Kuehl*, 706 F.3d 917, 920 (8th Cir. 2013); *Parks*, 698 F.3d at 7–8; *United States v. Whaley*, 577 F.3d 254, 264 (5th Cir. 2009); *United States v. Ambert*, 561 F.3d 1202, 1214 (11th Cir. 2009). This aim of creating a comprehensive database would counsel in favor of applying the registration requirement to all pre-Act offenders.

Mr. Cotonuts agrees that the policy declaration "would seem to call for subjecting all those convicted of a sex offense before SORNA to its requirements," but suggests that § 16901 should not guide our analysis because it "did not prompt *Congress* to reach all those with a sex-offense conviction."  Aplt. Opening Br. at 53 (emphasis added).  However, the fact that Congress could have taken the necessary action itself, but chose instead to delegate this responsibility, does not render a delegation impermissible.  "Perhaps [Congress] consciously desired the [Attorney General] to strike the balance at this level, thinking that

12

those with great expertise and charged with responsibility for administering the provision would be in a better position to do so." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 865 (1984). Indeed, SORNA's delegation allows the Attorney General to determine whether retroactive application "would be offset . . . by problems of administration, notice and the like for this discrete group of offenders—problems well suited to the Attorney General's on-the-ground assessment." *Parks*, 698 F.3d at 7–8. This policy statement itself is enough to convey an intelligible principle. *See Nichols*, 775 F.3d at 1231.

In *Nichols*, we also focused on SORNA's specification of "where the offender must register, the timeframe within which the offender must register, the method of registration, and the information the offender must include in the registry," *id.* at 1232 (citations omitted), in concluding that the statute "clearly delineate[s] the boundaries of the authority . . . delegated to the Attorney General," *id.* at 1231; *accord Cooper*, 750 F.3d at 272; *Goodwin*, 717 F.3d at 517; *Kuehl*, 706 F.3d at 920*; Guzman*, 591 F.3d at 93; *Whaley*, 577 F.3d at 264; *Ambert*, 561 F.3d at 1214. We emphasized that it was not just "the limited nature of the retroactive determination itself" that affected the nondelegation analysis, but also "the *guidance* Congress provided in other SORNA provisions." *Nichols*, 775 F.3d at 1232 (emphasis added). That is, SORNA's provisions do not just narrow the question the Attorney General must address, but also guide him in answering that question.

13

This nuance is important because the narrowness of the delegation, by itself, is not necessarily determinative in the nondelegation context. Instead, the impermissibility of a delegation turns on whether "there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible . . . to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944); *see Whitman*, 531 U.S. at 472 (stating that Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform" (alteration in original) (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. at 409)). Thus, Congress's specificity in enacting the registration scheme could further assuage nondelegation concerns, insofar as it provided the Attorney General with concrete clues as to how he or she should exercise discretion in applying SORNA retroactively. And Congress did so here. That is, the statutory scheme provided the Attorney General with information that is highly relevant to the question SORNA placed before him: the retroactive reach of its registration provisions.

**3**

Mr. Cotonuts's nondelegation argument ultimately rests on concurring and dissenting opinions in which several jurists have expressed misgivings about the breadth of SORNA's delegation to the Attorney General. *See, e.g.*, *Reynolds*, 132 S. Ct. at 986 (Scalia, J., dissenting) (arguing that Congress's decision to "leave it to the Attorney General to decide—with no statutory standard whatever governing

14

his discretion—whether a criminal statute will or will not apply to certain individuals" was "sailing close to the wind"); *Fuller*, 627 F.3d at 511 (Raggi, J., concurring) ("The Attorney General could simply flip a coin, and thereby make the more than 500,000 persons convicted of sex offenses before July 27, 2006, subject to SORNA's registration requirements—or not."); *Hinckley*, 550 F.3d at 948 (Gorsuch, J., concurring) (commenting on the Attorney General's "*unfettered discretion* to determine both *how* and *whether* SORNA [is] to be retroactively applied" (alteration in original) (quoting *United States v. Madera*, 528 F.3d 852, 858 (11th Cir. 2008) (per curiam))).

These opinions are, of course, not controlling, and while our court has intimated that the delegation here is perhaps close to the outer boundaries of what is permissible, we nevertheless have definitively concluded that SORNA effects a constitutional transfer of authority to the Attorney General. *See Nichols*, 775 F.3d at 1232 n.3 ("Although we agree that Congress's delegation of this important decision is puzzling, we conclude that it nonetheless passes constitutional muster." (citation omitted)). Thus, SORNA does not violate the nondelegation doctrine.

**B**

Mr. Cotonuts also challenges the requirement that he complete a sex offender treatment program "which may include . . . plethysmograph[s]" as a condition of supervised release. R., Vol. II, at 52. He argues that the district

15

court failed to make adequate findings to impose this significant burden on his liberty interests. However, important recent developments have significantly changed the status of this litigation. They lead us to conclude that Mr. Cotonuts's challenge to the plethysmograph requirement is moot.

**1**

After a full round of initial briefing and oral argument, we ordered supplemental briefing; our decision was prompted by Mr. Cotonuts's filing of a Notice of Subsequent Developments ("Notice") on September 25, 2015. This filing informed us that the district court had revoked the supervised-release term containing the penile-plethysmograph condition to which Mr. Cotonuts objected on appeal. The court had taken this action after Mr. Cotonuts admitted to two supervised-release violations—failing to reside in a residential reentry center as directed by his Probation Officer, and possessing and consuming alcohol. On July 24, 2015, the court entered an order, sentencing Mr. Cotonuts to a new term of supervised release; on its face, that order did not contain the challenged penile-plethysmograph condition.

In light of this material omission in the new supervised-release order, Mr. Cotonuts argued in the Notice that, in the context of this appeal from the original supervised-release order, our precedent obliged us to construe the new supervised-release order as *not* containing the allegedly objectionable penile-plethysmograph condition. *See United States v. Mike*, 632 F.3d 686, 696 (10th

16

Cir. 2011) (noting that "[w]ith it established that a district court cannot delegate the decision of whether to subject a defendant to . . . penile plethysmograph testing to the probation officer," and confronting a supervised-release condition that "due to its open-ended language . . . could be read to delegate such discretion," we ended up "[c]onstruing the challenged condition as *not* delegating to the probation officer the authority to decide whether to subject [the defendant] to . . . plethysmograph testing" (emphasis added)).

Significantly, Mr. Cotonuts's Notice ignored a serious jurisdictional question: whether our jurisdiction to review the challenged plethysmograph condition of the appealed-from, original supervised-release order was extinguished by the district court's subsequent decision to vacate that order upon the revocation of Mr. Cotonuts's supervised-release term and its imposition of a new supervised-release order containing facially distinct terms. Consequently, we requested a response from the government and a reply from Mr. Cotonuts, expressly asking for guidance on whether Mr. Cotonuts's challenge to the original supervised-release order containing the penile-plethysmograph condition remained viable. Rather than speaking to the jurisdictional question (at least in part), the government simply agreed with Mr. Cotonuts on the merits—that is, on how the express terms of the new supervised-release order should be construed in light of its omission of the penile-plethysmograph condition. In his reply, Mr.

17

Cotonuts made no mention of the latent jurisdictional issue and, instead, highlighted the agreement between the parties on the merits.

Despite the parties' agreement on the merits, however, we must address the jurisdictional question. We conclude that Mr. Cotonuts's challenge to the penile-plethysmograph condition is moot; therefore, we need not consider whether the district court failed to make adequate findings to impose the penile-plethysmograph condition.

**2**

We may not assume that we have subject-matter jurisdiction for the purpose of deciding claims on the merits. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). "[E]very federal appellate court has a special obligation to 'satisfy itself . . . of its own jurisdiction . . . in a cause under review,' even though the parties are prepared to concede it." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997) (alteration in original) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)). Article III of the United States Constitution limits the jurisdiction of federal courts to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *see Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011). We lack subject-matter jurisdiction if a case is moot. *See Valenzuela v. Silversmith*, 699 F.3d 1199, 1204–05 (10th Cir. 2012); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010).

Mootness is therefore "a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Rio Grande Silvery Minnow*, 601 F.3d at 1109 (quoting *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005)); *see also McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). "Without a live, concrete controversy, we lack jurisdiction to consider claims no matter how meritorious." *Rio Grande Silvery Minnow*, 601 F.3d at 1109 (quoting *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008)); *see Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007).

Although the parties neglected to address whether Mr. Cotonuts's challenge to the plethysmograph condition is now moot, "we raise the issue *sua sponte* '[b]ecause it involves the court's power to entertain the suit.'" *Jordan*, 654 F.3d at 1019 (alteration in original) (quoting *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 792 (10th Cir. 2009)); *see O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005). In considering whether an appeal is moot, we ask "whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande Silvery Minnow*, 601 F.3d at 1110 (quoting *Wyoming v. United States Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)); *see Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000).

19

"[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case, rather than issue an advisory opinion." *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015) (quoting *Stevenson v. Blytheville Sch. Dist. No. 5*, 762 F.3d 765, 768 (8th Cir. 2014)). "Events may supersede the occasion for relief, particularly when the requested relief is limited." *Jordan*, 654 F.3d at 1023 (quoting 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.3.1, at 56, 59–60 (3d ed. 2008) (footnotes omitted)). A case will become moot "when factual developments render a claim 'no longer live and ongoing,' such that a decision on the merits will not 'affect[] the behavior of the defendant toward the plaintiff.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (alteration in original) (quoting *McAlpine v. Thompson*, 187 F.3d 1213, 1216 (10th Cir. 1999)).

### a

In this case, a decision affirming or vacating the district court's original supervised-release order insofar as it imposed on Mr. Cotonuts the penile-plethysmograph condition would have no real-world effect because the district court revoked the supervised-release term that the original order put in place and entered a new supervised-release order with facially distinct requirements; consequently, neither the penile-plethysmograph condition, nor any other condition of the original supervised-release order has any current effect in the real

20

world.  Put another way, it is beyond peradventure that were we to give Mr. Cotonuts the relief he seeks in this appeal—*viz.*, if we declared that the district court improperly imposed on Mr. Cotonuts the penile-plethysmograph condition of the original supervised-release order and vacated it—our decision would not affect the parties' conduct relative to that condition one iota.  *Cf. United States v. Wynn*, 553 F.3d 1114, 1119 (8th Cir. 2009) ("Because [the defendant's] term of probation was revoked, his appeal of the conditions of probation is moot, except to the extent that he alleges the revocation was based on a purported violation . . . ." (citation omitted)).  Furthermore, no argument could be made here that the second supervised-release order is "a mirror image" of the first one, *Rio Grande Silvery Minnow*, 601 F.3d at 1111—even assuming *arguendo* that this factor has legal weight in the mootness analysis—because the second order contains facially distinct requirements, including with respect to sex-offender treatment.

Moreover, by neglecting to address the mootness issue at all in his supplemental briefing, Mr. Cotonuts has necessarily failed to demonstrate that lingering and viable collateral consequences stemming from the penile-plethysmograph condition of the original supervised-release order are sufficient to satisfy Article III's injury-in-fact requirement.  *See Spencer v. Kemna*, 523 U.S. 1, 7, 14 (1998) (noting that Article III requires that "some concrete and continuing injury other than the now-ended incarceration or parole—some

'collateral consequence' of the conviction—must exist if the suit is to be maintained" and "[t]he question remains" whether the prisoner resisting a mootness determination "demonstrated such consequences"); *see also United States v. Meyers*, 200 F.3d 715, 719 (10th Cir. 2000) (citing *Spencer* and noting that "[t]hus, the Court held that when a defendant challenges a parole revocation but has completed the sentence imposed upon revocation, the defendant bears the burden of demonstrating the existence of actual collateral consequences resulting from the revocation").

Germane to this appeal, we have held that the "[w]ithdrawal or alteration of administrative policies [mooted] an attack on those policies." *Rio Grande Silvery Minnow*, 601 F.3d 1117 (first alteration in original) (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991)). As with an appeal attacking regulatory policies that are subsequently withdrawn or materially altered, an appeal challenging a condition of a supervised-release order that is subsequently vacated and replaced with a new supervised-release order with distinct requirements is moot. *See id.* at 1111 ( "The problem for the Environmental Groups, however, is that neither the 2001 B.O. [i.e., Biological Opinion] nor 2002 B.O. still exists. . . . The 2003 B.O. establishes a new regulatory framework under which the propriety of Reclamation's actions must be judged."). If Mr. Cotonuts wished to challenge the supervised-release conditions imposed on him

22

by the second supervised-release order, he was obliged to file an appeal from that order.[7]

Indeed, recent significant events only reinforce our view that Mr. Cotonuts's sentencing appeal with respect to the penile-plethysmograph condition of his original supervised-release order is moot. Regrettably, the parties did not inform us of these significant events; we discovered them on our own.[8] From

---

[7] The time to appeal from the second supervised-release order has expired. *See* Fed. R. App. P. 4(b)(1)(A)(I) ("In a criminal case, a defendant's notice of appeal must be filed in the district court *within 14 days* after . . . the entry of either the judgment or the order being appealed . . . ." (emphasis added)). Mr. Cotonuts failed to file a notice of appeal. Even were we to assume that his Notice, which was submitted approximately two months after imposition of the second supervised-release order, could serve as the functional equivalent of a notice of appeal, *see Smith v. Barry*, 502 U.S. 244, 248–49 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal."), it would be time-barred under Rule 4's fourteen-day window.

[8] As we commented before, the failure of parties to inform our court of significant developments that could affect the viability of an appeal is "inexplicable and inexcusable." *Jordan*, 654 F.3d at 1020 n.11. We elaborated in *Jordan*:

> It is the parties, not the court, who are positioned to remain abreast of external factors that may impact their case; this is of particular importance where, as here, those factors directly pertain to this court's substantive inquiry. We look to the parties to inform us of such developments, and we should be assured that they will do so diligently. Their failure to do so in this case has resulted in the expenditure of significant judicial resources on issues that, in light of the current procedural posture of this case, are irrelevant.

*Id.* Those comments apply with full force here.

reviewing the district court docket sheet, we learned that not even the *second* supervised-release order—the subject of Mr. Cotonuts's Notice—is currently in effect. Specifically, on December 15, 2015, the court vacated the *second* supervised-release order after Mr. Cotonuts failed to report for a sex-offender intake appointment, a condition of his supervised release. The court then entered a *third* sentencing order, imposing a six-month prison term on Mr. Cotonuts. Importantly, there is no indication on the face of this order that the district court imposed a new term of supervised release to follow this prison term. Thus, it appears that, not only is Mr. Cotonuts no longer subject to a penile-plethysmograph condition of supervised release, he apparently is not subject to a supervised-release term at all. At the very least it can be said that the original supervised-release order containing the challenged penile-plethysmograph condition is *two* steps removed from the sentencing order that currently controls Mr. Cotonuts's conduct. Therefore, it seems beyond dispute that any relief regarding the penile-plethysmograph condition of the original supervised-release order that we might award would be completely illusory and have no real-world effect.

In sum, we simply cannot conclude that Mr. Cotonuts's challenge to the penile-plethysmograph condition of his original supervised-release order presents a live case or controversy. Accordingly, this portion of his appeal is moot and must be dismissed.

24

## III

For these reasons, we **AFFIRM** Mr. Cotonuts's conviction for failing to register as a sex offender under 18 U.S.C. § 2250, and **DISMISS** his appeal from the district court's supervised-release order.

Entered for the Court

JEROME A. HOLMES
Circuit Judge

13-1539, <u>United States v. Cotonuts</u>

**LUCERO**, J., concurring:

    Because the majority's reasoning and conclusion are compelled by our precedent, I join the majority's order and judgment.  However, I concur specifically to state my continued view that SORNA does not contain an intelligible principle upon which the Attorney General can evaluate SORNA's applicability to previous offenders.  The consequence has been to treat all previous offenders with a broad brush.  Nonetheless, our circuit has resolved the matter in <u>United States v. Nichols</u>, 775 F.3d 1225, 1231-32 (10th Cir. 2014), certiorari granted on other grounds, 136 S. Ct. 445 (2015), and I am bound by that conclusion.